Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:     516.741.4977
Facsimile:      516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES FARRELL, | Case No.: |
| Plaintiff, | COMPLAINT FOR: |
| vs. | (1) Violation of § 14(a) of the Securities Exchange Act of 1934 |
| GW PHARMACEUTICALS PLC, GEOFFREY GUY, JUSTIN GOVER, CABOT BROWN, DAVID GRYSKA, CATHERINE MACKEY, JAMES NOBLE, ALICIA SECOR, WILLIAM WALDEGRAVE, JAZZ PHARMACEUTICALS UK HOLDINGS LIMITED, and JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY. | (2) Violation of § 20(a) of the Securities Exchange Act of 1934 (3) Breach of Fiduciary Duties DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff, James Farrell ("Plaintiff"), by and through his attorneys, files this action against the

defendants, and alleges upon information and belief, except for those allegations that pertain to him,

which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder action against GW Pharmaceuticals plc. ("GW" or the

"Company") the Company's Board of Directors (the "Board" or the "Individual Defendants,"), Jazz

Pharmaceuticals Public Limited Company ("Parent"), and Jazz Pharmaceuticals UK Holdings Limited

("Merger Sub", and collectively with Parent, "Jazz, and together with GW and Individual Defendants,

- 1 -

COMPLAINT

the "Defendants"), for breaches of fiduciary duty as a result of the Individual Defendants' efforts to sell the Company to Jazz as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on an proposed transaction valued at approximately $7.2 billion (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a February 3, 2021 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, GW will become an indirect wholly-owned subsidiary of Parent, a subsidiary of the Jazz.  GW shareholders will receive $220 Jazz American Depositary Shares (ADSs) (each ADS representing $200 in cash and $20.00 of Jazz common stock) for each GW share.

3.      Thereafter, on March 15, 2021, GW filed a Definitive Proxy Statement on Form DEFM14A (the "Definitive Proxy Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Definitive Proxy Statement describes an insufficient process in which the Board did not conduct a market check for potentially interested third parties.

5.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell GW without first taking steps to ensure that Plaintiff as a public stockholder of GW would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or the Jazz without regard for Plaintiff and GW's public stockholders.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to GW stockholders.

6.      Next, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to the Company's public stockholders such as Plaintiff.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

7.      In violation of the Exchange Act and in further violation of their fiduciary duties, on March 15, 2021, Defendants caused to be filed the materially deficient Definitive Proxy Statement with the SEC in an effort to solicit Plaintiff and other GW stockholders to vote their GW shares in favor of the Proposed Transaction.  The Definitive Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties. As detailed below, the Definitive Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for GW and Jazz, provided by GW and Jazz to the Company's financial advisors Centerview Partners LLC ("Centerview") and Goldman Sachs & Co. LLC ("Goldman"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by Centerview and Goldman and provided to the Company and the Board.

8.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the breaches of fiduciary duties by Defendants.

**PARTIES**

9.      Plaintiff is a citizen of Florida and, at all times relevant hereto, has been a GW stockholder.

10.     Defendant GW is a biopharmaceutical company focused on discovering, developing and commercializing novel therapeutics from its proprietary cannabinoid product platform in a broad range of disease areas.  GW is organized under the laws of England and Wales and has its principal place of business at Sovereign House, Vision Park Chivers Way, Histon Cambridge, CB24 9BZ United Kingdom.  Shares of GW common stock are traded on the Nasdaq Stock Exchange under the symbol "GWPH."

11.     Defendant Geoffrey Guy ("Guy") has been a Director of the Company at all relevant times.  In addition, Guy serves as the Chairman of the Company Board and Founder of the Company.

12.     Defendant Justin Gover ("Gover") has been a director of the Company at all relevant times.  In addition, Gover serves as the Company's Chief Executive Officer ("CEO").

13.     Defendant Cabot Brown ("Brown") has been a director of the Company at all relevant times.

14.     Defendant David Gryska ("Gryska") has been a director of the Company at all relevant times.

15.     Defendant Catherine Mackey ("Mackey") has been a director of the Company at all relevant times.

16.     Defendant James Noble ("Noble") has been a director of the Company at all relevant times. In addition, Noble serves as the Company's Lead Independent Director and Deputy Chairman.

17.     Defendant Alicia Secor ("Secor") has been a director of the Company at all relevant times.

- 4 -

COMPLAINT

18.     Defendant William Waldegrave ("Waldegrave") has been a director of the Company at all relevant times.

19.     The defendants identified in paragraphs 11 through 18 are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

20.     Defendant Jazz a biopharmaceutical company, identifies, develops and commercializes pharmaceutical products for various unmet medical needs in the United States, Europe, and internationally. Jazz is organized under the laws of the Republic of Ireland and shares of Jazz common stock are traded on the Nasdaq Stock Exchange under the symbol "JAZZ."

21.     Defendant Merger Sub is a wholly owned subsidiary of Jazz created to effect the Proposed Transaction.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

23.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District;

COMPLAINT

for example, the Company's stock trades on the Nasdaq Stock Exchange which is headquartered in this District.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

25.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with GW and Plaintiff as a GW stockholder and owe the Company and Plaintiff the duties of due care, loyalty, and good faith.

26.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with GW and owe the Company and Plaintiff in his capacity as a Company stockholder the duties of due care, loyalty, and good faith.

27.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company and public stockholders of the Company such as Plaintiff.  To diligently comply with these duties, directors of a corporation must:

   a.     act with the requisite diligence and due care that is reasonable under the circumstances;

   b.     act in the best interest of the company and its stockholders such as Plaintiff;

   c.     use reasonable means to obtain material information relating to a given action or decision;

   d.     refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

   e.     avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

COMPLAINT

disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

28.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of GW, are obligated to refrain from:

a.     participating in any transaction where the directors' or officers' loyalties are divided;

b.     participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders, including Plaintiff; and/or;

c.     unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders, including Plaintiff.

29.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to GW and Plaintiff in his capacity as a public stockholder of GW, including their duties of loyalty, good faith, and due care.

30.     As a result of the Individual Defendants' divided loyalties, Plaintiff will not receive adequate, fair or maximum value for their GW common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

31.     GW a biopharmaceutical company, focuses on discovering, developing, and commercializing novel therapeutics from its proprietary cannabinoid product platform in various disease areas. The Company was founded in 1998 and is based in Cambridge, the United Kingdom.

32.     Its lead product is Epidiolex, an oral medicine for the treatment of seizures associated with Lennox-Gastaut syndrome, Dravet syndrome, or tuberous sclerosis complex. The company also develops and markets Sativex for the treatment of spasticity due to multiple sclerosis. In addition, it develops various product candidates for the treatment of schizophrenia, autism spectrum disorder, neuropsychiatric symptom, and neonatal hypoxic ischemic encephalopathy.

33.     The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated impressive financial results.  For example, in the January 11, 2021 Press Release announcing its 2020 Q4 and full year 2020 operational and financial results, the Company highlighted total net product sales of approximately $148 million for the fourth quarter and approximately $526 million for the year ended December 31, 2020. Total net product sales of Epidiolex were approximately $144 million for the fourth quarter, comprising $129 million in the US and $15 million ex-US. Total net product sales of Epidiolex for the year ended December 31, 2020 are expected to be approximately $510 million compared to $296 million in 2019.

34.     Defendant CEO Gover commented on the positive results in the Press Release, "'Epidiolex sales increased by over 70% in 2020 despite the challenges of COVID-19, reflecting the positive impact this medicine has on patients as well as the performance of our commercial team. We remain encouraged by our patients' experience on this product, as demonstrated by high persistence and refill rates. This, combined with our expansion of payer coverage and the recently approved Tuberous Sclerosis Complex indication, leads us to expect continued strong growth in 2021 in both the US and Europe... Our goals in 2021 include driving further Epidiolex growth and advancing multiple US pivotal trials for nabiximols in the treatment of MS spasticity, with the first data readout expected this year. In addition to our previously announced pipeline activities, we are leveraging our

world leadership in cannabinoid science to design and synthesize novel cannabinoid molecules and expect our first novel product candidate to enter the clinic in 2021.'"

35.     Despite this upward trajectory and financial promise, the Individual Defendants have caused GW to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

36.     As detailed in the Definitive Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Jazz.

37.     First, the Definitive Proxy Statement indicates that no market check for potentially interested third parties was conducted at any point in the sales process.

38.     In addition, the Definitive Proxy Statement is silent as to the nature of the two confidentiality agreements entered into between the Company and Jazz throughout the sales process, in what specific ways these agreements differed from each other, and the specific terms of any included "don't-ask, don't-waive" provisions or standstill provisions, including the specific conditions, if any, under which such provisions would fall away.

39.     Finally, the Definitive Proxy Statement gives no reasoning as to why the engagement of both Centerview and Goldman was necessary, considering that each are due $36 million from the Company in exchange for their services in relation to the Proposed Transaction.

40.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

COMPLAINT

*The Proposed Transaction*

41.    On February 3, 2021, GW and Jazz issued a joint press release announcing the

Proposed Transaction.  The press release stated, in relevant part:

> DUBLIN and LONDON, Feb. 3, 2021 /PRNewswire/ -- Jazz Pharmaceuticals plc (Nasdaq: JAZZ) and GW Pharmaceuticals plc (Nasdaq: GWPH) today announced the companies have entered into a definitive agreement for Jazz to acquire GW for $220.00 per American Depositary Share (ADS), in the form of $200.00 in cash and $20.00 in Jazz ordinary shares, for a total consideration of $7.2 billion, or $6.7 billion net of GW cash. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close in the second quarter of 2021.
>
> Upon close of the transaction, the combined company will be a leader in neuroscience with a global commercial and operational footprint well positioned to maximize the value of its diversified portfolio.
>
> GW is a global leader in discovering, developing, manufacturing and commercializing novel, regulatory approved therapeutics from its proprietary cannabinoid product platform to address a broad range of diseases. The company's lead product, Epidiolex® (cannabidiol) oral solution, is approved in patients one-year and older for the treatment of seizures associated with Lennox-Gastaut Syndrome (LGS), Dravet Syndrome and Tuberous Sclerosis Complex (TSC), all of which are rare diseases characterized by severe early-onset epilepsy. *Epidiolex* was the first plant-derived cannabinoid medicine ever approved by the U.S. Food and Drug Administration (FDA). This product has also been approved, under the tradename Epidyolex®, by the European Medicines Agency (EMA) in patients two years of age and older for the adjunctive treatment of seizures associated with LGS and Dravet syndrome in conjunction with clobazam and is under EMA review for the treatment of seizures associated with TSC. In addition to the approved indications for *Epidiolex*, there are considerable opportunities to pursue other indications within the epilepsy field, including other treatment-resistant epilepsies where significant unmet needs of patients exist.
>
> Beyond *Epidiolex*, GW has a scientific platform and deep innovative pipeline of cannabinoid product candidates, as well as highly specialized manufacturing expertise, developed over two decades of pioneering and building leadership in cannabinoid science. This pipeline includes nabiximols, for which the company is in Phase 3 trials to seek FDA approval for treatment of spasticity associated with multiple sclerosis and spinal cord injury, as well as earlier-stage cannabinoid product candidates for autism and schizophrenia.
>
> "Jazz is proud of our leadership position in sleep medicines and rapidly growing oncology business. We are excited to add GW's industry-leading cannabinoid platform, innovative pipeline and products, which will strengthen and broaden our neuroscience portfolio, further diversify our revenue and drive sustainable, long-term value creation

opportunities," said Bruce Cozadd, chairman and CEO of Jazz Pharmaceuticals. "We are joining two teams that share a passion for, and track record of, developing differentiated therapies that advance science and transform the lives of patients. This will help facilitate a successful integration and bring added capabilities to Jazz. Given the strength of our balance sheet and the meaningful financial drivers of the transaction, we are confident in the value we can deliver to both companies' shareholders and patients. We look forward to welcoming the GW team to Jazz to build an even stronger company."

"Over the last two decades, GW has built an unparalleled global leadership position in cannabinoid science, including the successful launch of Epidiolex, a breakthrough product within the field of epilepsy, and a diverse and robust neuroscience pipeline. We believe that Jazz is an ideal growth partner that is committed to supporting our commercial efforts, as well as ongoing clinical and research programs," said Justin Gover, CEO of GW Pharmaceuticals. "We have a shared vision of developing and commercializing innovative medicines that address significant unmet needs in neuroscience and an approach of putting patients first. Together, we will have an opportunity to reach and impact more patients through a broader portfolio of neuroscience-focused therapies than ever before."

**Transaction Terms**

Under the terms of the agreement, holders of GW ADSs, which each represent 12 GW ordinary shares, will be entitled to receive $220.00 for each GW ADS, of which $200.00 will be paid in cash and $20.00 in Jazz ordinary shares. This represents a premium of approximately 50 percent over GW's closing stock price on February 2, 2021, of $146.25 and 60 percent over GW's 30-day volume weighted average price of $137.17.

The number of Jazz ordinary shares to be issued to the holders of GW ADSs will be based on the volume-weighted average price of Jazz's ordinary shares over a 15 trading day period preceding the closing date of the transaction, subject to limitations on the maximum and minimum number of Jazz ordinary shares issuable per GW ADS based on a price range of $139.72 to $170.76 per Jazz ordinary share. Holders of GW ordinary shares that are not in ADS form will be entitled to receive the foregoing consideration divided by 12 per ordinary share.

The cash portion of the transaction consideration is expected to be funded through a combination of cash on hand and debt financing. Jazz has obtained fully committed debt financing from BofA Securities and J.P. Morgan Securities LLC. The financing includes a meaningful portion of pre-payable debt, in line with Jazz's commitment to rapid deleveraging.

**Closing Conditions**

The transaction has been unanimously approved by the Boards of Directors of both companies, and is subject to the approval of GW shareholders, sanction by the High Court of Justice of England and Wales and other customary closing conditions,

- 11 -

COMPLAINT

including regulatory approvals. Subject to the satisfaction or waiver of the closing conditions, the transaction is expected to close in the second quarter of 2021.

***The Inadequate Merger Consideration***

42.    Significantly, the Company's financial prospects, opportunities for future growth, and synergies with Jazz establish the inadequacy of the merger consideration.

43.    First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial results.

44.    Following the announcement of the Proposed Transaction, *Seeking Alpha* released its analysis of the deal, saying, "Having a long position in GW for about a year, it feels like a fair deal for both companies and a potentially great deal for Jazz in the long run. $220 per share is near the low end of my $209-289 valuation range (valuation and articles on GW were available to Growth Stock Forum subscribers), but my valuation was only based on Epidiolex in the three approved indications (90% of the valuation) and nabiximols in MS spasticity (10% of the valuation), and I estimated the combined peak sales potential of the two assets to be in the $1.5 billion to $1.9 billion range. The additional upside optionality is in the rest of GW's pipeline – potential label expansion for Epidiolex (cannabidiol) and nabiximols, and the early-stage pipeline, including the recently announced plans for the development of synthetic cannabinoids which could improve upon Epidiolex's efficacy in rare epilepsies… Jazz is acquiring a leader in cannabinoid-based medicines and a very successful commercial platform. Epidiolex sales reached $510 million in 2020, its second full year on the market, and I believe it is well on its way to exceeding $1 billion in sales, in 2023 or as soon as next year. And it got to more than $500 million in net sales in Dravet syndrome and Lennox-Gastaut syndrome… And Epidiolex is only getting started in Europe (its brand name is Epydiolex in Europe). It was only launched in Germany and the UK, and additional countries are expected to come online during 2021."

45.    The Proposed Transaction also represents a significant synergistic benefit to Jazz, which operates in the same industry as GW, and will use the new assets, operational capabilities, and

- 12 -

brand capital to bolster its own position in the market.  *The Motley Fool* released an article on February 16, 2021 where two analysts discussed the Proposed Transaction, specifically covering the benefits, "[Jazz is] going to be facing a fairly tough time because their big seller is a narcolepsy drug called Xyrem. I could be pronouncing that wrong. X-Y-R-E-M, I think it's pronounced Xyrem. That forms the bulk of their revenue, which is great, except generics are coming. It's getting toward the end of its patent life. Generics are going to be coming by 2023, and that's tomorrow in terms of the pharmaceutical industry. It's coming very fast, in other words. They need an asset or they need something that's going to anchor them for a little while -- a fairly unique drug that's not going to be under patent drug for a while. Epidiolex is perfect for that. It's the only medication approved in the U.S. that's based on cannabis substances. It was recently approved and because of that, it doesn't lose patent exclusivity until 2035, unless I'm greatly mistaken. It's proven to be effective, it's getting more popular. 2020 sales last year: GW took in $510 million from it. That's up 72% year-on-year, which tells you something about the trajectory of that drug. Again, since it was recently approved, it's just getting started."

46.     Accordingly, the Proposed Transaction will allow Jazz to purchase GW at an unfairly low price while availing itself of GW's significant value and upside or long-term potential. It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Jazz at the expense of Plaintiff as a GW stockholder, which clearly indicates Plaintiff and other GW stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

47.     The Merger Agreement contains certain provisions that unduly benefit the Jazz by making an alternative transaction either prohibitively expensive or otherwise impossible.  Notably, in the event of termination, the merger agreement requires GW to pay up to $71.5 million to the Jazz and/or its affiliates, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, GW must pay this termination payment even if it consummates any competing Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more

expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

48.     The Merger Agreement also contains a "No Solicitation" provision that restricts GW from considering alternative acquisition proposals by, *inter alia*, constraining GW's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a *"Superior Proposal"* as defined in the Merger Agreement.

49.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide to the Jazz and/or its affiliates information in order to match any other offer, thus providing the Jazz access to the unsolicited bidder's financial information and giving Parent the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Jazz.

50.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company, Plaintiff and its public stockholders.

51.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

52.     The breakdown of the benefits of the deal indicate that GW insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of GW.

COMPLAINT

53.     Notably, Company insiders, currently own large, illiquid portions of Company stock that will be exchanged for the merger consideration upon the consummation of the Proposed Transaction.

54.     Moreover, while the Definitive Proxy Statement does provide the information below, it fails to provide an accounting for the number of cash and Jazz stock that Company insiders will receive as a consequence of the merger being consummated:

| Name of Beneficial Owner | Number | Percent |
|---|---|---|
| **Beneficial Owners of More than 5% of GW ordinary shares** | | |
| Capital Research and Management Company[1] | 49,785,676 | 13.16% |
| Janus Henderson Group plc[2] | 23,703,612 | 6.26% |
| Franklin Resources, Inc.[3] | 23,080,308 | 6.10% |
| **Named Executive Officers and Directors:*** | | |
| Dr. Geoffrey Guy[4] | 5,401,063 | 1.43% |
| Justin Gover[5] | 3,418,724 | * |
| Dr. Volker Knappertz[6] | 301,452 | * |
| Scott Giacobello[7] | 300,732 | * |
| Douglas Snyder[8] | 216,456 | * |
| Cabot Brown[9] | 90,761 | * |
| James Noble[10] | 90,000 | * |
| William Waldegrave[11] | 48,792 | * |
| Alicia Secor[12] | 45,924 | * |
| Dr. Catherine Mackey[13] | 45,876 | * |
| Darren Cline[14] | 5,556 | * |
| David Gryska | 0 | |
| *All executive officers and directors as a group (13 persons)* | 10,220,035 | 2.69% |

55.     Moreover, upon the consummation of the Proposed Transaction, the Definitive Proxy Statement indicates that each outstanding Company stock option, restricted stock unit awards, and performance stock unit awards will be canceled and converted into the right to receive certain consideration according to the merger agreement as follows:

| Name | Unvested Share Options | | Total |
|---|---|---|---|
| | (# GW ADSs) | ($) | ($) |
| *Directors* | | | |
| James Noble | 6,381 | $ 1,166,519 | $ 1,166,519 |
| Cabot Brown | 6,381 | $ 1,166,519 | $ 1,166,519 |
| Catherine Mackey | 6,381 | $ 1,166,519 | $ 1,166,519 |
| Alicia Secor | 6,381 | $ 1,166,519 | $ 1,166,519 |
| William Waldegrave | 6,381 | $ 1,166,519 | $ 1,166,519 |
| David Gryska | 4,806 | $ 1,057,224 | $ 1,057,224 |

| Name | Unvested Pre-2021 Share Options | Unvested 2021 Share Options | Total |
|---|---|---|---|

| | (# GW ADSs) | ($) | (# GW ADSs) | ($) | ($) |
|---|---|---|---|---|---|
| *Executive Officers* | | | | | |
| Geoffrey Guy | 53,742 | $ 10,743,561 | 17,836 | $ 3,923,876 | $ 14,667,437 |
| Justin Gover | 105,788 | $ 21,103,706 | 35,639 | $ 7,840,518 | $ 28,944,224 |
| Darren Cline | 38,150 | $ 7,563,099 | 10,159 | $ 2,235,080 | $ 9,798,179 |
| Scott Giacobello | 32,576 | $ 6,532,636 | 9,495 | $ 2,088,710 | $ 8,621,346 |
| Volker Knappertz | 35,185 | $ 7,048,315 | 10,357 | $ 2,278,479 | $ 9,326,794 |
| Douglas Snyder | 33,920 | $ 6,793,196 | 9,820 | $ 2,160,422 | $ 8,953,618 |
| Chris Tovey | 30,169 | $ 6,033,924 | 9,136 | $ 2,009,737 | $ 8,043,661 |
| Adam D. George | 2,676 | $ 588,720 | | — $ | $ 588,720 |

56.     Certain employment agreements with certain GW executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff and GW's common stockholders and will be paid out as follows:

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites / Benefits ($)[3] | Total ($) |
|---|---|---|---|---|
| Dr. Geoffrey Guy | $ 1,215,113 | $ 14,667,437 | $ 6,210 | $ 15,888,760 |
| Justin Gover | $ 10,071,472 | $ 28,944,224 | $ 42,240 | $ 39,057,936 |
| Scott Giacobello | $ 3,637,101 | $ 8,621,346 | $ 46,680 | $ 12,305,127 |
| Dr. Volker Knappertz | $ 3,798,681 | $ 9,326,794 | $ 46,680 | $ 13,172,155 |
| Douglas Snyder | $ 3,742,806 | $ 8,953,618 | $ 46,680 | $ 12,743,104 |

57.     The Definitive Proxy also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

58.     Thus, while the Proposed Transaction is not in the best interests of GW, Plaintiff or its stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Definitive Proxy Statement***

59.     On March 15, 2021, the GW Board and Jazz caused to be filed with the SEC a materially misleading and incomplete Definitive Proxy Statement that, in violation their fiduciary duties, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

60.     Specifically, the Definitive Proxy Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Definitive Proxy Statement fails to disclose**:**

      a.  Adequate reasoning as to why no market check was conducted for potentially interested third parties;

      b.  The nature of any specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between GW on the one hand and any interested third party, including Jazz, on the other, the manner in which those agreements differed from each other, if at all; and

      c.  Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would

prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

*Omissions and/or Material Misrepresentations Concerning GW's Financial Projections*

61.     The Definitive Proxy Statement fails to provide material information concerning financial projections provided by GW management and relied upon by Centerview and Goldman in their analyses.  The Definitive Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

62.     The Definitive Proxy Statement indicates that in connection with the rendering of their fairness opinion, Centerview reviewed, "internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of GW, including certain financial forecasts, analyses and projections relating to GW prepared by management of GW and furnished to Centerview by GW for purposes of Centerview's analysis, which are referred to in this summary of Centerview's opinion as the "December Forecasts".

63.     Moreover, the Definitive Proxy Statement indicates that in connection with the rendering of their fairness opinion Goldman reviewed, "internal financial analyses and forecasts for GW prepared by its management, as approved for Goldman Sachs' use by GW, which are referred to as the "December Forecasts".

64.     Accordingly, the Definitive Proxy Statement should have, but fails to provide, certain information in the projections that GW management provided to the Board, Centerview, and Goldman. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

65.     The Definitive Proxy Statement fails to provide material information concerning the financial projections prepared by GW management.

66.     Specifically, in regards to the "July Forecasts of GW Management", the Definitive Proxy Statement fails to disclose all material line items for the metrics of:

    a.  Total Revenue, including the specific underlying assumptions made and utilized by GW management regarding the probability of success for each of the products and product candidates; and

    b.  EBIT, including the underlying metrics of, net income, interest expense, and tax expense.

67.     In regards to the "December Forecasts of GW Management", the Definitive Proxy Statement fails to disclose all material line items for the metrics of:

    a.  EBIT, including the underlying metrics of, net income, interest expense, tax expense, and unallocated research and development expense; and

    b.  EBIT (Excl. Unallocated R&D), including the underlying metrics of, net income, interest expense, and tax expense.

68.     In regards to the "GW Unlevered Free Cash Flow Calculated by Goldman Sachs", the Definitive Proxy Statement fails to disclose all material line items including: depreciation and amortization, taxes, capital expenditures and changes in net working capital.

69.     In regards to the "GW Net Operating Loss Utilization Used by Goldman Sachs", the Definitive Proxy Statement fails to disclose all material line items including: cash interest income.

70.     The Definitive Proxy Statement also provides non-GAAP financial metrics, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

71.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this

information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

72.     Without accurate projection data presented in the Definitive Proxy Statement, Plaintiff is are unable to properly evaluate the Company's true worth, the accuracy of Centerview or Goldman's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Definitive Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning Jazz's Financial Projections*

73.     The Definitive Proxy Statement fails to provide material information concerning financial projections for Jazz.

74.     The merger consideration is composed party of Jazz stock.

75.     Accordingly, the Definitive Proxy Statement should have, but fails to provide, certain information in the projections regarding Jazz that GW may have utilized in determining the value of the Proposed Transaction.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

76.     Notably the Definitive Proxy Statement provides no projection information for Jazz whatsoever.

77.     In addition, the Definitive Proxy Statement indicates that neither Centerview nor Goldman considered any projection or forecast information for Jazz in rendering their fairness opinions.

COMPLAINT

78.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

79.     Without accurate projection data presented in the Definitive Proxy Statement, Plaintiff is are unable to properly evaluate the Jazz's true worth and thus the true worth of a significant portion of the merger consideration offered under the Proposed Transaction, the accuracy of Centerview's and Goldman's determination of fairness, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached its fiduciary duties by failing to include such information in the Definitive Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Centerview*

80.     In the Definitive Proxy Statement, Centerview describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

81.     With respect to the *Selected Public Companies Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

    a.  The specific inputs and assumptions utilized to select a reference range of 2022E EV/Revenue Multiples of 4.0x to 6.5x; and

    b.  The number of fully diluted outstanding GW ADS-equivalent GW ordinary shares as of January 29, 2021.

COMPLAINT

82.     With respect to the *Selected Transactions Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions utilized to select a reference range of Two-Year Forward Revenue Multiples of 5.0x to 5.7x;

    b.   The number of fully diluted outstanding GW ADS-equivalent GW ordinary shares as of January 29, 2021;

    c.   The date on which each selected precedent transaction was announced;

    d.   The date on which each selected precedent transaction closed; and

    e.   The value of each selected precedent transaction.

83.     With respect to the *Discounted Cash Flow Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to calculate the applied discount rate range of 9.5% to 11.5%;

    b.   GW's weighted average cost of capital;

    c.   The implied terminal value of GW;

    d.   The specific inputs and assumptions utilized by Centerview to calculate that that unlevered free cash flows would decline in perpetuity after December 31, 2035 at a range of rates of free cash flow decline of 10% to 40% year over year; and

    e.   The number of fully diluted outstanding GW ADS-equivalent GW ordinary shares as of January 29, 2021.

84.     With respect to the *Discounted Cash Flow Analysis Sensitivity Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

COMPLAINT

    a.   The specific inputs and assumptions used to determine the applied midpoint discount rate range of 10.5%; and

    b.   The specific inputs and assumptions used to determine the applied midpoint perpetuity growth rate range (25%).

85.    With respect to the *Wall Street Analysts Price Targets* for GW, the Definitive Proxy Statement fails to disclose the following:

    a.   The specific price targets used; and

    b.   The identity of the Wall Street Analysts for each price target used.

86.    With respect to the *Premia Paid Analysis* for GW the Definitive Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to determine the applied range of 40% to 80% utilized.

87.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

88.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a public GW stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public GW stockholder.  As such, the Board has breached their fiduciary duties by failing to include such information in the Definitive Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Goldman*

89.     In the Definitive Proxy Statement, Goldman describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

90.     With respect to the *Illustrative Discounted Cash Flow Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

a.  The specific inputs and assumptions used to calculate the applied discount rate range of 9.5% to 11.5%;

b.  GW's weighted average cost of capital;

c.  The range of illustrative terminal values of GW utilized;

d.  The specific inputs and assumptions utilized by Goldman to calculate that that the utilized perpetuity growth rate range of 0.0% to 2.0%; and

e.  Certain company-specific inputs, utilized including

i.  the company's target capital structure weightings;

ii.  the cost of long-term debt;

iii.  after-tax yield on permanent excess cash, if any;

iv.  future applicable marginal cash tax rate and a beta for the company; as well as

v.  certain financial metrics for the United States financial markets generally; and

f.  The number of fully diluted outstanding GW ADS-equivalent GW ordinary shares as of January 29, 2021.

COMPLAINT

91.     With respect to the *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis* for GW, the Definitive Proxy Statement fails to disclose the following:

  a.  The specific inputs and assumptions used to calculate the applied discount rate range of 9.5% to 11.5%;

  b.  GW's weighted average cost of capital;

  c.  The Estimated unlevered free cash flow to be generated from:

      i.   Epidiolex through 2026;

      ii.  Epidiolex post 2026;

      iii. nabiximols / Sativex, ;

      iv.  New Organic Products; and

      v.   Platform;

  d.  The range of illustrative terminal values of GW utilized;

  e.  The specific inputs and assumptions utilized by Goldman to calculate that that the utilized perpetuity growth rate ranges as follows:

      i.   Epidiolex through 2026 at 0%;

      ii.  Epidiolex post 2026 at 0%;

      iii. nabiximols / Sativex at 0% ;

      iv.  New Organic Products at 0%; and

      v.   Platform at 3%; and

  f.  The number of fully diluted outstanding GW ADS-equivalent GW ordinary shares as of January 29, 2021.

92.     With respect to the *Premia Analysis* for GW the Definitive Proxy Statement fails to disclose the following:

COMPLAINT

    a.   The specific value of each transaction analyzed; and

    b.   The specific inputs and assumptions used to determine the applied illustrative premium reference range of 45% to 73% applied to the undisturbed closing price pre GW ADS of $144.07 as of February 1, 2021;

    c.   The specific inputs and assumptions used to determine the applied illustrative premium reference range of 20% to 52% applied to the 52-week high closing price per GW ADS of $158.47 as of February 1, 2021.

93.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

94.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a public GW stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public GW stockholder. As such, the Board has breached their fiduciary duties by failing to include such information in the Definitive Proxy Statement.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**<u>(Against the Individual Defendants)</u>**

95.    Plaintiff repeats all previous allegations as if set forth in full herein.

96.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff in his capacity as a Company public stockholder.

97.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive of the true value of his investment in GW.

98.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to Plaintiff in his capacity as a stockholder of GW by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of GW to its public stockholders, including Plaintiff.

99.     Indeed, Defendants have accepted an offer to sell GW at a price that fails to reflect the true value of the Company, thus depriving Plaintiff of the reasonable, fair and adequate value of his shares.

100.     Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff all material information necessary for him to make an informed decision on whether to vote his shares in favor of the Proposed Transaction.

101.     The Individual Defendants dominate and control the business and corporate affairs of GW, and are in possession of private corporate information concerning GW's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of GW such as Plaintiff which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

102.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff.

103.     As a result of the actions of the Individual Defendants, Plaintiff will suffer irreparable injury in that he has not and will not receive his fair portion of the value of GW's assets and has been and will be prevented from obtaining a fair price for his common stock.

104.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff, all to the irreparable harm of Plaintiff.

COMPLAINT

105.    Plaintiff and has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### Against Defendants GW, Parent, and Merger Sub

106.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

107.    Defendants GW Parent, and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

108.    As a result of this conduct, Plaintiff has been and will be damaged in that he has been and will be prevented from obtaining a fair price for his shares.

109.    Plaintiff has no adequate remedy at law.

## THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

110.    Plaintiff repeats all previous allegations as if set forth in full herein.

111.    Defendants have disseminated the Definitive Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote their shares in favor of the Proposed Transaction.

112.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

113.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

114.    The Definitive Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Definitive Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

115.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

116.    The Individual Defendants were at least negligent in filing a Definitive Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Definitive Proxy Statement not misleading.

117.    The misrepresentations and omissions in the Definitive Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in

COMPLAINT

favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

118.   Plaintiff repeats all previous allegations as if set forth in full herein.

119.   The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Definitive Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

120.   The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Definitive Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Definitive Proxy Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Definitive Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

121.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of GW's business, the information contained in its filings with the SEC, and its public

COMPLAINT

statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Definitive Proxy Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Definitive Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

122.    The Individual Defendants acted as controlling persons of GW within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause GW to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled GW and all of its employees.  As alleged above, GW is a primary violator of Section 14 of the Exchange Act and SEC Rule Preliminary Proxy.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor, and against the Defendants, as follows:

A.    Enjoining the Proposed Transaction;

B.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

D.    Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for GW and obtain a transaction which is in the best interests of GW and its stockholders, including Plaintiff;

COMPLAINT

E.    Directing defendants to account to Plaintiff for damages sustained because of the wrongs complained of herein;

F.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.    Granting such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 17, 2021

**BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone:  (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*

- 32 -

COMPLAINT